**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION**

VINSON HARDAGE                  §
                                §
VS.                             §                  No: 5:21cv137-RWS-JBB
                                §
COMMISSIONER OF SSA             §

<u>**REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**</u>

On November 3, 2021, Vinson Hardage ("Plaintiff") initiated this civil action pursuant to the Social Security Act ("The Act"), Section 405(g) of Title 42 for judicial review of the Commissioner's denial of Plaintiff's application for Social Security benefits. The Court is of the opinion the above-entitled Social Security action should be **AFFIRMED**.

<u>**HISTORY OF THE CASE**</u>

On October 10, 2019, Plaintiff protectively filed an application for period of disability and disability insurance benefits, alleging he became disabled on October 1, 2019, due to a back injury (Dkt. No. 9 ("Tr.") at 10, 539). The state Disability Determination Services denied his application initially and on reconsideration (Tr. 10, 548, 563). Plaintiff requested an administrative hearing (Tr. 10, 581-82). On February 23, 2021, Plaintiff, represented by an attorney, testified before an Administrative Law Judge ("ALJ") (Tr. 10, 15-16, 507-25, 527-28). On April 13, 2021, the ALJ entered a decision finding Plaintiff has not been under a disability from October 1, 2019 through the date of the ALJ's decision (Tr. 10-20). The Appeals Council denied Plaintiff's request for review on September 7, 2021 (Tr. 1-9), thereby rendering the ALJ's April 13, 2021 decision the Commissioner's final decision for judicial review. *See* 42 U.S.C. § 405(g).

## STATEMENT OF THE FACTS

*Age, education, and work experience*

Plaintiff was born on July 26, 1966 and was fifty-four years of age at the time of the hearing (Tr. 511, 539). Plaintiff has a college education and past work experience as a bus driver, technology teacher, fast food manager, programmer analyst, and home health aide (Tr. 19, 511-14).

*Medical record evidence*

On January 7, 2011, Plaintiff presented to Collom & Carney Clinic complaining of neck and back pain (Tr. 157). Plaintiff reported he had recently fallen while skiing, hurt his lower back, and "flared up some neck pain." (Tr. 157). Paul Smith, CFNP, noted Plaintiff was taking Flexeril and Hydrocodone. He further noted the plan was to add Medrol and order x-rays of Plaintiff's neck and lumbar sacral spine (Tr. 157).

On January 14, 2011, Plaintiff presented to Collom & Carney Clinic for fasting labs (Tr. 156). Nurse Practitioner Smith prescribed Meloxicam and Tramadol (Tr. 156). On June 20, 2011, Plaintiff presented to Collom & Carney Clinic complaining of back pain after a fall (Tr. 153-54). On examination, Nurse Practitioner Smith noted there was good range of motion in Plaintiff's neck, but there was "marked decreased range of motion of the lumbosacral spine with radiation of pain down into the right buttocks with tingling and numbness into the right leg at times." (Tr. 153). The assessment was lumbosacral strain with radicular pain to the right leg (Tr. 154).

An August 30, 2011, MRI of Plaintiff's cervical spine showed the following impression:

1.    No subluxations identified with flexion or extension.
2.    Very mild disc volume loss at C5-6.
3.    Post-operative changes C6-7.

(Tr. 37).

On October 7, 2011, Plaintiff presented to Collom & Carney Clinic with a burn on his right forearm (Tr. 147-49). Plaintiff also requested steroids for his back (Tr. 147). Nurse Practitioner Smith noted on examination "a marked decreased range of motion in the lumbar sacral spine with radiation of pain down both buttocks to both legs at times." (Tr. 149). Nurse Practitioner Smith assessed Plaintiff with chronic lower back pain with radicular pain to lower extremities and prescribed pain medications (Tr. 149).

On January 23, 2012, Plaintiff presented to Collom & Carney Clinic, complaining of back pain, numbness, and tingling in his upper extremities (Tr. 144-47). Plaintiff also reported neck pain (Tr. 145). Nurse Practitioner Smith noted Plaintiff had "marked decreased range of motion to the cervical spine" as well as "marked decreased range of motion to the lumbosacral spine" with radiation of pain at times into both buttocks (Tr. 145-46). Nurse Practitioner Smith assessed Plaintiff with severe degenerative disc disease of the cervical and lumbosacral spine with radicular pain to the upper extremities (Tr. 146). He ordered an MRI of Plaintiff's cervical spine (Tr. 146).

A January 24, 2012 MRI of Plaintiff's cervical spine showed the following impression:

1.    Prior ACDF at C6-7 with mild degenerative changes at C5-6.
2.    Minimal anterolisthesis of C7 on T1, which does not change between flexion and extension positions.

(Tr. 35).

A February 16, 2012 MRI of Plaintiff's lumbar spine showed an impression of degenerative changes with disc space narrowing and spurring at T12-L1 and L2-3 (Tr. 34). It further showed as follows:

Degenerative disc disease in the lumbar spine with mild disc bulge at L2-3 causing mild spinal canal narrowing, a left neural foraminal bulge at L3-4 causing left neural foramen narrowing, and a small broad-based bulge at L4-5 causing mild bilateral neural foramen narrowing.

(Tr. 32).

On March 2, 2012, Plaintiff returned to Collom & Carney Clinic to discuss low back pain therapy and to request medication refills (Tr. 140-43). Nurse Practitioner Smith assessed Plaintiff with unresolved lumbosacral pain with radicular pain to the lower extremities (Tr. 141). Nurse Practitioner Smith refilled Plaintiff's Hydrocodone, prescribed Neurontin, and recommended continued physical therapy (Tr. 142).

On November 5, 2012, Plaintiff presented at Collom & Carney Clinic for pain in his tailbone and groin area (Tr. 136-39). Nurse Practitioner Smith noted in the physical exam that Plaintiff had marked decreased range of motion of the lumbar sacral spine, radiation of pain laterally and medially down the right groin and in the right thigh area, and the pain was easily reproduced by Plaintiff (Tr. 138). He assessed Plaintiff with lumbago and spasm of muscle (Tr. 138-39).

On February 11, 2013, Plaintiff returned to Collom & Carney Clinic for neck pain (Tr. 131-35). Nurse Practitioner Smith noted Plaintiff was positive for back pain, joint pain, joint swelling, and neck pain (Tr. 133). Nurse Practitioner Smith assessed Plaintiff with generalized osteoarthritis, pain in joint involving shoulder region, and spasm of muscle (Tr. 134). He prescribed Sterapred, Flexeril, and Hydrocodone and directed Plaintiff to follow up with his neurosurgeon if not greatly improved in three to four days (Tr. 134-35).

A March 18, 2013 MRI of Plaintiff's cervical spine showed an impression of mild progression of the degenerative changes at the C5-C6 level with slight reversal of the normal lordotic curve, but no other significant interval changes (Tr. 31). An April 10, 2013 MRI of Plaintiff's cervical spine showed the following impression:

1.      Prior anterior cervical discectomy and fusion at C6-7.

2.      Moderate posterior disc protrusion at C5-6 causing moderate spinal canal narrowing and bilateral neural foramen narrowing.

3.      Mild posterior disc bulge at C3-4, with spinal canal lower limits of normal at C3-4 and C4-5.

(Tr. 29).

A June 11, 2013 MRI of Plaintiff's lumbar spine showed the following impression:

Degenerative changes in the lumbar spine with moderate disc space narrowing and spurring at T12-L1 and L2-3, mildly increased at L2-3 with questionable pars defects at L2. There are also apparent degenerative changes at the left SI joint.

(Tr. 28).

A July 8, 2013 MRI of Plaintiff's lumbar spine showed the following impression:

1.      Mild to moderate hypertrophic spurring at a few levels with bulging of the disc and degenerative disc disease at multiple levels.

2.      Mild facet joint arthropathy is present at the lower lumbar levels and moderate disc space narrowing at the T12-L1 level.

3.      Mild to moderate disc space narrowing and vertebral body endplate changes present at the L2-3 level and there is mild disc space narrowing at the L3-4 level, with alignment and disc space otherwise well maintained.

4.      At the L2-3 level, there is prominent diffuse bulging of the disc resulting in minimal central spinal stenosis with minimal neural foraminal encroachment, no focal disc protrusion noted.

5.      At the L3-4 level, there is asymmetric bulging or broad-based protrusion laterally on the left resulting in minimal central spinal stenosis with minimal neural foraminal encroachment on the left, no significant encroachment on the left is identified.

6.      At the L4-5 level, there is minimal central spinal stenosis with minimal neural foraminal encroachment bilaterally.

7.      At the L5-S1 level, there is mild spurring present about both SI joints, left greater than right.

(Tr. 27).

On August 15, 2016, Plaintiff presented to Collom & Carney Clinic with a fractured lumbar spine after a multi-vehicle accident (Tr. 117-21). Nurse Practitioner Smith assessed Plaintiff with fractured first, second, third, and fourth lumbar vertebra (Tr. 120). Nurse Practitioner Smith

discussed securing an MRI of the lumbar sacral spine (Tr. 120). He then prescribed Concerta, Cyclobenzaprine, Gabapentin, and Hydrocodone (Tr. 120).

On October 30, 2016, Plaintiff presented to North Central Surgical Center for a CT scan of his lumbar spine (Tr. 853-54). Aaron Lloyd, M.D., found a shallow bulge at the L4-5 level, a broad bulge and degenerative changes at the L3-4 level, and broad-based bulge and mild central canal stenosis at the L2-3 level (Tr. 853). The scan showed the following impression:

1. Bilateral L2 pars interarticularis defects, no malalignment.
2. Degenerative disc disease L2-3 with dispersal of contrast throughout the nucleus and annulus.
3. Left posterior lateral annular rent L3-4 with contrast extending from the nucleus into the outer annulus on the left.
4. Dispersal of contrast from the nucleus into the inner annulus posterior laterally on the right and left at L4-5.
5. Disc bulge and mild central canal stenosis L3-4 and L2-3.

(Tr. 854).

On August 19, 2016, Plaintiff presented to Texas Spine Consultants for a lumbar evaluation with Andrew Park, M.D. (Tr. 811-14). Plaintiff rated his pain as 9/10, throbbing and sharp in his lower back (Tr. 811). He reported difficulty standing, walking, bending, rising from sitting, and lying prone (Tr. 811). Dr. Park diagnosed Plaintiff with low back pain; radiculopathy of the lumbar region; intervertebral disc degeneration of the lumbar region; wedge compression fracture of the third lumbar vertebra; and wedge compression fracture of the fourth lumbar vertebra (Tr. 813).

On September 2, 2016, Plaintiff presented to HealthCARE Express for radiology interpretation which showed the following impression:

1. Annular tear at L2-L3, L3-L4, and L4-L5, a tiny left paracentral disc herniation at L2-L3, and mild neural foramen narrowing at L4-L5.
2. Left 12th rib fracture, and transverse process fractures left L1, L2, L3, and L4.

(Tr. 828).

On September 21, 2016, Plaintiff presented to Texas Spine Consultants to follow up on a lumbar MRI (Tr. 829-31). Plaintiff rated his pain as 6/10 that radiated to his left thigh and was "tingling." (Tr. 830). Dr. Park reviewed the MRI images and assessed Plaintiff with low back pain; radiculopathy, lumbar region; other intervertebral disc degeneration, lumbar region; wedge compression fracture of the third lumbar vertebra; and wedge compression fracture of the fourth lumbar vertebra (Tr. 830).

On December 6, 2016, Plaintiff presented at Methodist Hospital for surgery (Tr. 817). Dr. Park performed the following operation:

1.  Anterior lumbar fusion at L2-3, L3-4, and L4-5.
2.  Anterior lumbar intervertebral body cage preparation and insertion at L2-3, L3-4, and L4-5.
3.  Anterior lumbar instrumentation fixation screws at L2, L3, L4, and L5.
4.  Posterior spinal fusion from L2 to L5.
5.  Posterior lumbar instrumentation L2 to L5.
6.  Anterior lumbar osteotomy for deformity correction and correction of kyphosis.

(Tr. 817-20).

On March 27, 2017, Plaintiff presented to NeuroDiagnostic Laboratories, complaining of bilateral buttocks, upper leg, and left lower leg aching (Tr. 824-27). Examination showed reduced amplitude and decreased conduction velocity in left and right nerves (Tr. 824). The scan showed an impression of right L5 radiculopathy (Tr. 825).

On August 2, 2017, Plaintiff presented to Texas Spine Consultants for a post-op follow up with Dr. Park (Tr. 821-23). Plaintiff described his pain as 3-4/10 and "burning." (Tr. 822). He reported that the pain increased with activity, hard chairs, and overhead work, but standing and walking decreased the pain (Tr. 822). Dr. Park diagnosed Plaintiff with low back pain and radiculopathy of the lumbar region (Tr. 822).

On December 21, 2016, Plaintiff returned to Texas Spine Consultants, complaining of lumbar pain (Tr. 815-16). Plaintiff stated his pain was constant, with his low back pain being 10/10 with sharpness in his thighs and numbness/tingling in his ankles (Tr. 815). On examination, Mary Elizabeth Hooper, PA-C, noted Plaintiff's gait was non-antalgic, and range of motion showed no pain (Tr. 815-16). Physician Assistant Hooper's impression was low back pain and radiculopathy of the lumbar region (Tr. 816). Regarding the plan, Hooper noted Plaintiff's x-rays looked good and that all the hardware was intact and in the correct place (Tr. 816). She recommended walking as the best therapy but advised no overhead work and no "intense bending/extending." (Tr. 816).

On January 18, 2017, Plaintiff returned to Texas Spine Consultants for a post-op follow up with Dr. Park (Tr. 848-50). Plaintiff stated his lower back pain was constant and 8/10 with throbbing in the back and tingling in the thighs (Tr. 849). Dr. Park instructed Plaintiff not to over-do physical activity, advising that in three months he would start to see improvement (Tr. 849). Dr. Park prescribed Percocet and Gabapentin and advised Plaintiff to return in two months (Tr. 849).

An April 17, 2017, CT myelogram of the lumbar spine showed the following impression:

1.  Surgical changes of lumbar interbody fusion with posterior hardware.
2.  Left-sided transverse process fractures have healed, however, with nonunion noted at the level of L2.
3.  Bilateral pars interarticularis defects at the level of L2.
4.  Mild central canal stenosis at level L4-L5.
5.  No osseous neural foraminal stenosis is apparent.
6.  Incidental punctuate bilateral renal pyramidal calcifications.

(Tr. 851-52).

On July 5, 2017, Plaintiff presented to Texas Spine Consultants after having had "revision of hardware PSF L2-L5" two weeks prior (Tr. 842-43). Physician Assistant Hooper noted Plaintiff was doing better since surgery but still complained of pain in his back (Tr. 842). Hooper explained

to Plaintiff that the burning back pain was most likely the "trauma done to the muscles" and recommended no overhead work, lifting over fifteen to twenty pounds, or intense bending/extending (Tr. 843).

On October 31, 2018, returned to Collom & Carney Clinic, complaining of low back pain (Tr. 108-11). Nurse Practitioner Smith noted that Plaintiff's low back pain recently returned and the frequency "ha[s] been all the time." (Tr. 108). Nurse Practitioner Smith further noted that the severity was "mild to moderately severe" and "nothing he does makes the symptoms better or worse." (Tr. 108). He assessed Plaintiff with radiculopathy of the thoracolumbar region and muscle spasm of the back (Tr. 110). Nurse Practitioner Smith prescribed pain medications and instructed Plaintiff to return in two to three days if not greatly improved (Tr. 110).

On February 15, 2019, Plaintiff presented to Collom & Carney Clinic for mental health and medication management checkup with Edward Tobey, M.D. (Tr. 472-80). Plaintiff stated his history as having depression and attention-deficit hyperactivity disorder ("ADHD") (Tr. 472). Dr. Tobey described Plaintiff as "doing very well," having no difficulties with depression and controlled anxiety (Tr. 473). He diagnosed Plaintiff with major depressive disorder, single episode, severe without psychotic features; ADHD; and long-term drug therapy (Tr. 478-79). Dr. Tobey prescribed Rexulti, Propranolol, Methylphenidate, Cymbalta, and Ativan (Tr. 479).

Plaintiff returned to Collom & Carney Clinic on July 10, 2019, for a medication management appointment with Dr. Tobey (Tr. 463-71). Dr. Tobey evaluated Plaintiff with no return of depressive symptoms, anxiety levels controlled, and bright affect (Tr. 463). He assessed Plaintiff with major depressive disorder, single episode, severe without psychotic features; ADHD; and other long-term drug therapy (Tr. 470).

On September 5, 2019, Plaintiff presented to Collom & Carney Clinic, complaining of an exacerbation of low back pain with radicular pain down both legs (Tr. 100-03). Nurse Practitioner Smith noted the pain severity as "mild to moderately severe." (Tr. 100). He assessed Plaintiff with radiculopathy of the thoracolumbar region and muscle spasm of the back (Tr. 102).

On October 21, 2019, Plaintiff presented to Collom & Carney Clinic for a medication management appointment with Dr. Tobey (Tr. 456-62). Dr. Tobey stated Plaintiff reported doing well with his mood, with no return of depressive mood and consistent anxiety levels (Tr. 457). He further stated Plaintiff had bright affect and organized thoughts (Tr. 457). He diagnosed Plaintiff with major depressive disorder, single episode, severe without psychotic features; ADHD; and long-term drug therapy (Tr. 460). Dr. Tobey prescribed Methylphenidate and Ativan and instructed Plaintiff to return in four months (Tr. 457, 461).

In January 2020, State Agency psychological consultant Margaret Meyer, M.D., opined that Plaintiff's mental symptoms would not significantly compromise his capacity for work related abilities, and Plaintiff was not limited to unskilled work due to his impairments (Tr. 544, 548). On reconsideration in September 2020, SAPC Susan Posey, Psy.D., reviewed the record and found Plaintiff's "report of minimal mental functional limitations/sxs [symptoms] is consistent with the medical evaluation and overall EOR [ evidence of record]" (Tr. 558). Dr. Posey further found that Plaintiff's "limitations imposed no more than a non-severe impact [on] functioning." (Tr. 558).

On February 10, 2020, Plaintiff presented to Collom & Carney Clinic with complaints of lower back pain with radicular pain down both buttocks (Tr 96-99). Nurse Practitioner Smith noted the pain frequency as "all the time" and severity as "mild to moderately severe." (Tr. 96). He assessed radiculopathy of the thoracolumbar region and muscle spasm of the back (Tr. 98). He

started Plaintiff on Steraprad Dosepak, Flexeril, and instructed him to use Ibuprofen after he finished steroid use (Tr. 99).

On May 4, 2020, Plaintiff presented to Collom & Carney Clinic for medication management (Tr. 449-54). Dr. Tobey noted Plaintiff reported "doing well despite significant stress" due to significant back injury and that Plaintiff had filed for disability (Tr. 450). He noted Plaintiff used Lorazepam as needed for anxiety, and his mood and affect were bright (Tr. 450). Dr. Tobey assessed major depressive disorder, single episode, severe without psychotic features; ADHD; and long-term drug therapy (Tr. 453). He prescribed Plaintiff with vitamin B-12, multivitamins, and Ativan, and instructed Plaintiff to return in six months (Tr. 450, 454).

On August 4, 2020, Plaintiff returned to Collom & Carney Clinic for lower back pain with radicular pain down both buttocks and legs (Tr. 92-95). Nurse Practitioner Smith noted the pain frequency as "all the time" and severity as "[m]oderately severe." (Tr. 92). He assessed radiculopathy of the thoracolumbar region and muscle spasm of the back (Tr. 94). Nurse Practitioner Smith prescribed Plaintiff Sterapred Dosepak, Flexeril, and Tylenol as needed for pain (Tr. 94).

On September 12, 2020, Plaintiff presented to EverMed Exams for a medical report from Kevin West, M.D. (Tr. 890-99). Dr. West noted Plaintiff's history of lower back pain since the automobile accident in 2017 for which he was seeing a doctor two or three times per year (Tr. 890). He stated Plaintiff's pain was constant in his lower back and radiated down his left leg; on the day of the visit the pain was 5/10, but most days was only 3/10 (Tr. 890). Plaintiff described the pain as "sharp, shooting, aching, pressure, burning, intense, and exhaustive." (Tr. 890). Plaintiff stated the pain limited his function and made it difficult to lift things (Tr. 890). Dr. West diagnosed Plaintiff with posttraumatic lower back pain post spinal fusion from L2 to L5 (Tr. 894).

He opined Plaintiff had limitations with walking, lifting and carrying heavy weight, and bending, stooping, crouching, and squatting due to lower back pain (Tr. 894). Dr. West stated there were no limitations with reaching, grasping, handling, fingering, and feeling (Tr. 894-95).

On September 14, 2020, Plaintiff presented to CHRISTUS St. Michael Health System for lumbar spine radiographs (Tr. 481-83). Samuel Gatzert, M.D., noted that examination revealed chronic degenerative remodeling of the T12 and L1 vertebral bodies and degenerative facet hypertrophy and sclerosis at L4-5 and L5-S1 (Tr. 481).

On October 26, 2020, Plaintiff presented at Collom & Carney Clinic to complain of an exacerbation of lower back pain (Tr. 88-91). Nurse Practitioner Smith noted the severity of the pain as moderate (Tr. 88). In the physical exam, he noted Plaintiff exhibited a "marked decreased range of motion to the lumbar sacral spine" and "radicular pain down both buttocks and legs past the knees." (Tr. 90).

On November 10, 2020, Plaintiff returned to Collom & Carney Clinic for medication management (Tr. 442-48). Dr. Tobey noted Plaintiff reported his depression symptoms were in remission, and he continued to seek disability due to impairments from a fracture of his spine (Tr. 443). He stated Plaintiff had no recent changes to his medical health, his affect was bright, and his thoughts were well-organized (Tr. 443). Dr. Tobey assessed Plaintiff with major depressive disorder, single episode, severe without psychotic features; ADHD; and long-term drug therapy (Tr. 446).

On January 5, 2021, Plaintiff presented to Collom & Carney Clinic for medication management (Tr. 435-41). Dr. Tobey noted that Plaintiff had become quite depressed with his upcoming disability trial, was not sleeping at night, and obsessively worried (Tr. 436). He assessed Plaintiff with major depressive disorder, single episode, severe without psychotic features; ADHD,

predominantly inattentive type; and long-term drug therapy (Tr. 440). He prescribed Plaintiff Mirtazapine and scheduled a follow up appointment in two months (Tr. 440-41).

On March 12, 2021, Plaintiff returned to Collom & Carney Clinic for a medication management appointment with Dr. Tobey (Tr. 428-34). Dr. Tobey noted Plaintiff reported "doing very well with his mood," and there was no return of depression or anxiety (Tr. 429). He further noted that Plaintiff's energy levels were good, affect was bright, and thoughts were well organized (Tr. 429). He assessed Plaintiff with major depressive disorder, single episode, severe without psychotic features, prescribed Mirtazapine and Bupropion, and scheduled a follow up in three months (Tr. 433-34).

## THE HEARING

### *Plaintiff's testimony*

During the hearing, Plaintiff's counsel argued that Plaintiff is unable to perform even sedentary work due to "catastrophic back injury," including spinal fusion at L2/L5, a revision of that fusion, and cage insertion (Tr. 510). Counsel further stated that the resulting pain is unbearable, and Plaintiff must spend the majority of his day in a reclined position (Tr. 510).

Plaintiff testified he was fifty-four years of age and has a college degree in business management (Tr. 511). He stated he has not worked since October 2019, with his only income since that time being a severance package (Tr. 511).

Plaintiff stated in 2006 he had worked as a school bus driver and technology teacher (Tr. 512). In 2012, he worked for a year as a technology director and shift manager for a fast-food restaurant (Tr. 513). Next, Plaintiff worked as a programmer analyst for a bank until his back problems made it too painful for him to carry equipment (Tr. 514-15). Plaintiff testified he worked

as a home health aide from 2016-2019, wherein he sat with a friend's daughter and ensured she had "whatever she needed." (Tr. 527).

Plaintiff testified that after his car accident in 2016, his ability to pick up things, reach below his knees, and walk for an extended period of time "was completely gone." (Tr. 516). Plaintiff stated it takes him "about 45 minutes to an hour" before he can operate every morning, and throughout the day, he can do minor things but with constant breaks for stretches or laying down (Tr. 517). Plaintiff testified he has about two to three bad days a week, wherein pain travels into his hips and down his left leg below the knee (Tr. 517). Plaintiff testified he is currently taking a prescription pain reliever which reduces the pain from "an eight or a nine" to "a five or a six" on a scale of ten (Tr. 518). Plaintiff stated that picking up objects, constantly bending and standing, or moving quickly can aggravate his back pain (Tr. 519).

Plaintiff testified he did have a ruptured disc in his neck that still affects his left arm (Tr. 519). He stated his left arm is "a lot weaker" and atrophied (Tr. 519). In day-to-day use, his left arm will become inflamed and "feels like it's going to sleep." (Tr. 519-20).

Plaintiff testified he has no problems walking short distances, but if he were to walk one hundred yards he would "start having problems." (Tr. 520). He stated that he can stand at a counter or table for several minutes, but if he stands for more than twenty minutes, he can feel the pressure in his lower back and needs to stretch (Tr. 520-21). He testified he has no problems staying seated for short periods of time, but if he is seated too long, he has to stretch (Tr. 521). Plaintiff further testified that he has difficulty going up and down stairs, especially coming down if it is a long flight (Tr. 521). Plaintiff testified that he can comfortably lift ten to fifteen pounds once or twice, but repetitively cannot lift even five pounds (Tr. 521). In addition, Plaintiff has difficulty sleeping when his back is in pain, which further compounds his back issues (Tr. 522).

Plaintiff testified he lives with his wife and her son and is capable of helping with some chores (Tr. 523). He can fold clothes and drive for groceries, but he cannot help with chores requiring bending, such as moving clothes from the washing machine to the dryer (Tr. 524). Plaintiff stated he used to perform woodworking and yard work, but he is no longer able to perform these hobbies (Tr. 524).

Plaintiff testified he is unable to perform his past work as a programmer because sitting for hours hurts his back (Tr. 525). According to Plaintiff, sitting in a chair, bent over the computer, "tightens up his back" and causes sharp pains running down his legs (Tr. 525).

***Vocational expert testimony***

A vocational expert also testified at the hearing (Tr. 525-31). The vocational expert characterized Plaintiff's past work as follows: (1) high school teacher, SVP 7 and medium exertional level; (2) school bus driver, SVP 4 and medium exertional level; (3) technology director, SVP 8 and sedentary exertional level; (4) work shift manager, SVP 5 and light exertional level; (5) programmer, SVP 7 and sedentary exertional level; and (6) home health aide, SVP 3 and medium exertional level (Tr. 528).

The ALJ asked the vocational expert to assume a hypothetical individual of Plaintiff's age, education, and work experience who is limited to sedentary work; can lift/carry and push/pull up to ten pounds occasionally and less than ten pounds frequently; can stand and walk for up to two hours and sit for up to six hours in an eight-hour workday; can occasionally climb ramps and stairs, but cannot climb ladders, ropes, or scaffolds; can occasionally balance, stoop kneel, crouch, and crawl; and is limited to occasional exposure to hazards, such as unprotected heights and dangerous moving machinery (Tr. 529). The vocational expert testified that the hypothetical individual could perform Plaintiff's past work as a programmer as generally performed (Tr. 529-30).

For the next hypothetical, the ALJ asked the vocational expert to assume the same limitations as the first hypothetical individual, but with the additional limitation that the person would be limited to frequent handling and fingering with the upper left extremity (Tr. 530). The vocational expert testified that the hypothetical individual could still perform the programmer job; however, if the hypothetical individual were to be limited to occasional handling and fingering, the person would not be able to perform the job as a programmer (Tr. 530).

For the next hypothetical, the ALJ asked the vocational expert to assume the hypothetical person in the first two hypotheticals could perform frequent handling and fingering but must be "allowed to alternate between sitting and standing at will, provided the person does not leave the workstation." (Tr. 530). According to the vocational expert, the hypothetical person would not be able to perform the programmer job (Tr. 530).

The vocational expert further testified that Plaintiff would not have acquired skills doing his previous jobs that would transfer to a lower skilled or semiskilled job within the recent hypothetical (Tr. 530-31). According to the vocational expert, employers in unskilled work environments are willing to tolerate up to ten percent of time off task and absenteeism of no more one day per month (Tr. 531).

## **APPLICABLE LAW**

### *Standard of review*

In an appeal under § 405(g), the Court must review the Commissioner's decision to determine whether there is substantial evidence in the record to support the Commissioner's factual findings and whether the Commissioner applied the proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion. *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985); *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983). The Court cannot reweigh the evidence or substitute its judgment for that of the Commissioner, *Bowling v. Shalala*, 36 F.3d 431, 434 (5th Cir. 1995), and conflicts in the evidence are resolved by the Commissioner, *Carry v. Heckler*, 750 F.2d 479, 482 (5th Cir. 1985).

### *Entitlement to benefits*

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence. *Plaisance v. U.S. Comm'r, SSA*, No. 6:18-CV-00033, 2019 WL 2608884, at *14 (W.D. La. May 13, 2019), *report and recommendation adopted sub nom. Plaisance v. U.S. Comm'r*, No. 6:18-CV-00033, 2019 WL 2607498 (W.D. La. June 25, 2019) (citing 42 U.S.C. § 423(a)). The Supplemental Security Income ("SSI") program provides income to individuals who meet certain income and resource requirements, have applied for benefits, and are disabled. *Plaisance*, 2019 WL 2608884, at *14 (citing 42 U.S.C. § 1382(a)(1) & (2)).

A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Plaisance*, 2019 WL 2608884, at *14 (citing 42 U.S.C. § 1382(c)(a)(3)(A)). A claimant is disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work. *Plaisance*, 2019 WL 2608884, at *14 (citing 42 U.S.C. § 1382(c)(a)(3)(B)).

*Sequential evaluation process and burden of proof*

Pursuant to the statutory provisions governing disability determinations, the Commissioner has promulgated regulations that establish a five-step process to determine whether a claimant suffers from a disability. 20 C.F.R. § 404.1520 (2012). First, a claimant who, at the time of his disability claim, is engaged in substantial gainful employment is not disabled. 20 C.F.R. § 404.1520(a)(4)(i) (2012). Second, the claimant is not disabled if his alleged impairment is not severe, without consideration of his residual functional capacity, age, education, or work experience. 20 C.F.R. § 404.1520(a)(4)(ii) (2012). Third, if the alleged impairment is severe, the claimant is considered disabled if his impairment corresponds to a listed impairment in 20 C.F.R., Part 404, Subpart P, Appendix 1 (2011). 20 C.F.R. § 404.1520(a)(4)(iii) (2012). Fourth, a claimant with a severe impairment that does not correspond to a listed impairment is not considered disabled if he is capable of performing his past work. 20 C.F.R. § 404.1520(a)(4)(iv) (2012). Finally, a claimant who cannot return to his past work is not disabled if he has the residual functional capacity to engage in work available in the national economy. 20 C.F.R. § 404.1520(a)(4)(v) (2012). If, at any step, the claimant is determined to be disabled or not disabled, the inquiry is terminated. *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007) (citing *Lovelace v. Bowen,* 813 F.2d 55, 58 (5th Cir. 1987)).

Under the first four steps of the sequential analysis, the burden lies with the claimant to prove disability. *Audler,* 501 F.3d at 448. If the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant can perform. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical–Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen,* 810

F.2d 1296, 1304 (5th Cir. 1987). However, this process is used only when an initial determination of disability is being evaluated, not when a claimant is already receiving disability benefits. *See* 20 C.F.R. § 404.1520(a)(5). The Code explicitly states, "If you are already receiving disability benefits, we will use a different sequential evaluation process to decide whether you continue to be disabled. We explain this process in § 404.1594(f)." *Id.*

### THE ALJ'S FINDINGS AND CONCLUSIONS

Applying the five-step sequential evaluation process, the ALJ first found Plaintiff meets the insured status requirements of the Act through December 31, 2024 (Tr. 12). At step one, the ALJ found Plaintiff did not engage in substantial gainful activity from his alleged onset date, October 1, 2019 (Tr. 12). At step two, the ALJ found Plaintiff has the severe impairments of status post lumbar fusion of the L2-L5 with radiculopathy and chronic pain syndrome (Tr. 12-14). At step three, the ALJ found Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 14).

The ALJ next found that Plaintiff has the residual functional capacity to perform less than sedentary work as defined in 20 C.F.R. § 404.1567(a), except that he is able to lift and carry up to ten pounds occasionally and lesser amounts frequently; sit for six hours, stand and/or walk for two hours in an eight-hour workday; cannot climb ladders, ropes, or scaffolds, but can occasionally climb ramps and stairs; can occasionally balance, stoop, kneel, crouch, and crawl; can frequently handle and finger with the left upper extremity; and must avoid more than occasional exposure to hazards such as unprotected heights and dangerous moving machinery (Tr. 15-19). At step four, the ALJ found Plaintiff is capable of performing past relevant work as a programmer (Tr. 19). The

ALJ concluded that Plaintiff was not disabled from October 1, 2019, his alleged onset date, through the date of the ALJ's decision (Tr. 19).

## ANALYSIS

"The Commissioner's decision is granted great deference and will not be disturbed unless the reviewing court cannot find substantial evidence in the record to support the Commissioner's decision or finds that the Commissioner made an error of law." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). Substantial evidence is a term of art used to describe how courts are to review agency fact finding. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Under the substantial-evidence standard, a court looks to the existing administrative record to determine whether it contains sufficient evidence to support the agency's factual determinations. *Id.* Although "substantial" has a different meaning in other contexts, the threshold of sufficient evidence to satisfy the substantial evidence standard "is not high." *Id.* Substantial evidence requires more than a mere scintilla of evidence, but it "means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Moreover, a claimant also bears the burden of showing any alleged error of law was prejudicial because the Supreme Court has recognized the doctrine of harmless error applies to administrative determinations, and the Fifth Circuit has specifically held it will not vacate a judgment unless the substantial rights of a party are affected. *See Shinseki v. Sanders*, 556 U.S. 396, 407-08 (2009); *Jones v. Astrue*, 691 F.3d 730, 734 (5th Cir. 2012); *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).

The overarching issues are whether substantial evidence of record supports the Commissioner's decision that Plaintiff was not disabled during the relevant period, and whether the ALJ applied the correct legal standards in reaching that decision. Asserting substantial evidence does not support the ALJ's decision, Plaintiff's appeal brief raises the following three issues: (1) whether the ALJ, in finding Plaintiff could return to his past work as a programmer, failed to comply with SSR 96-8p in his evaluation of the 2016-17 opinions of Physician Assistant Mary Elizabeth Hooper that Plaintiff should avoid overhead reaching; (2) whether the ALJ failed to comply with SSR 96-8p by not considering the effect of Plaintiff's depression and ADHD on his ability to perform his past work as a programmer; and (3) whether the ALJ failed to evaluate Plaintiff's work history when discrediting his subjective complaints. In its response, the Commissioner asserts substantial evidence supports the ALJ's "highly-restrictive limited sedentary" residual functional capacity assessment, which included restrictions in frequent fingering and handling in the left extremity. Dkt. No. 12 at 6.

In his first claim of error, Plaintiff states that even though the ALJ acknowledged that Plaintiff would have fingering and handling restrictions, the ALJ failed to explain why he did not rely on Physician Assistant Hooper's December 2016 and July 2017 opinions, both formed only two weeks after surgery, that he should avoid overhead work. Dkt. No. 11 at 3-4. According to Plaintiff, the ALJ erred by not including a reaching restriction in the residual functional capacity assessment based on those post-operative reports. *Id.* at 4. Plaintiff argues that had the ALJ properly evaluated and adopted Hooper's opinions concerning Plaintiff's overhead reaching restrictions, then Plaintiff's past work as a programmer would be eliminated. *Id.*

According to the Commissioner, the ALJ noted in his opinion that the relevant period for this case began in October 2019; thus, Physician Assistant Hooper's opinions regarding Plaintiff's

overhead reaching abilities in 2016 (two weeks post-op) and 2017 (again, two weeks post-op) are not relevant to the ALJ's decision for the period under review.  Even so, at step two of his analysis, the ALJ considered, among other things, that "the remote records documented spinal injuries after a motor vehicle accident in 2016, requiring lumbar fusion." (Tr. 12). The ALJ also noted that "[b]y August 2017, there was improvement in pain and functioning" but that Plaintiff continued to have chronic pain treated with prescription medications and a diagnosis of chronic pain syndrome (Tr. 13).

Within his first claim for relief, Plaintiff challenges the ALJ's assessment of Plaintiff's residual functional capacity. Residual functional capacity is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 404.1545(a)(1). It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). An individual's residual functional capacity should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources. 20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184, at *1. The ALJ's residual functional capacity decision can be supported by substantial evidence even if she does not specifically discuss all the evidence that supports her decision or all the evidence that she rejected. *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994).

A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564. Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). Courts "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.* Courts may not reweigh the evidence or substitute their judgment for that of the Commissioner, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *Jodie C.*, 2019 WL 3101689, at *16 (citation omitted).

Here, after considering Plaintiff's symptoms and the extent to which the symptoms could reasonably be accepted as consistent with the object medical evidence and other evidence and according partial weight to Plaintiff's statements regarding the intensity, persistence and limiting effects of the alleged symptoms to the extent these limit Plaintiff's ability to perform sedentary work-related activities (Tr. 15-17), the ALJ considered the opinions of the state agency medical consultants (Tr. 17). The ALJ noted the evidence of record documented overall stability of Plaintiff's chronic pain with a residual ability to perform within a range of sedentary exertion (Tr. 18). Specifically, the ALJ explained that Plaintiff was able to return to full time work activity after stability of the spinal injuries and associated surgery prior to the alleged onset date (Tr. 18). The ALJ further stated Plaintiff's pain was managed with conservative medications prescribed by Plaintiff's primary care provider, noting there was no medical treatment for pain or radiculopathy after September 2019 (Tr. 18) (noting this indicated "the acute exacerbation of low back pain and radiculopathy was responsive to the medication therapy, and the baseline chronic pain was

managed with over the counter medications"). The ALJ then addressed at length how the "clinical and diagnostic findings on consultative examination" in September 2020² were supportive of the residual functional capacity assessment (Tr. 18). In summary, the ALJ stated as follows:

> Based on the foregoing, the undersigned finds the claimant has the above residual functional capacity assessment, which is supported by the overall evidence of record. There was minimal treatment evidence after the alleged onset date. However, the prior records clearly documented a significant spinal fusion related to a remote injury. This was consistent with the diagnostic imaging revealing fusion of the L2 through L5 levels. . . . In addition, there was evidence of baseline chronic pain managed conservatively with occasional exacerbations of chronic pain that responded well to medication intervention. The clinical findings on consultative medical examination documented the decreased range of motion of the spine and the slightly decreased motor strength in the left lower extremity. It also found a normal and unassisted gait. . . . Moreover, the reported activities of daily living were consistent with sedentary exertion. The additional limitations on postural movements avoids exacerbations of pain and fatigue. Similarly, secondary to the occasional use of prescription pain medication, exposure to hazards was limited. The undersigned also notes that despite the normal clinical findings related to the upper extremities, in giving the claimant's statements partial weight, manipulative movements of the left upper extremity was slightly limited. Overall, the clinical and diagnostic findings, and the other evidence of record was consistent with an ability to perform within the above residual functional capacity on a regular and consistent basis.

(Tr. 19).

According to the Commissioner, the ALJ properly addressed the relevant medical opinion evidence under the relevant regulations, including the opinion of consultative examiner Kevin West, M.D., who evaluated Plaintiff in September 2020 during the relevant period and found Plaintiff had no limitations with reaching. The Commissioner further asserts the ALJ properly expanded his view beyond just the medical evidence and also addressed Plaintiff's "rather extensive activities of daily living," finding they were consistent with a sedentary range of work Dkt. No. 12 at 7 (citing Tr. 19). The Court agrees.

The ALJ correctly relied on this relevant evidence in assessing Plaintiff's residual functional capacity. As the ALJ discussed, Dr. West's examination findings, the longitudinal

medical record, as well as Plaintiff's own reported work activities and other daily activities, provide substantial support for the ALJ's limited sedentary residual functional capacity finding. Additionally, as pointed out by the Commissioner, Plaintiff reported that he continued to work as a programmer until 2019, two to three years after surgeries and after Physician Assistant Hooper advised he should avoid overhead work. In addition to his programming job, at least through November 2019, Plaintiff reported that he worked as a sitter "keep[ing] a girl with a disability." (Tr. 704). Plaintiff's ability to work with his impairments for some years after Hooper's reports, and after his alleged onset date, supports a finding that the impairments were not disabling or more limiting than the ALJ determined. *See Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995) ("The record reflects that Vaughan was able to, and did, work for several years while suffering from ailments she now asserts are disabling."). Plaintiff's claim of error regarding Physician Assistant Hooper's 2016-2017 opinions fails to show reversible error.

Plaintiff's second claim of error – that the ALJ should have included mental limitations in the residual functional capacity assessment – is also unsupported by the record evidence. Plaintiff asserts that because the ALJ found "ADHD and depression were non-severe," the ALJ's residual functional capacity determination lacked any limitations concerning his mental functioning. Dkt. No. 11 at 5 (further asserting the ALJ failed to consider the impact of Plaintiff's non-severe mental impairments on his capacity to perform his past relevant skilled work as a programmer). However, the ALJ explained earlier in his opinion that he "considered all of [Plaintiff's] impairments, including impairments that [were] not severe," when assessing residual functional capacity (Tr. 11-12).

During the hearing, Plaintiff testified that he did not have any mental conditions or limitations that the ALJ needed to know about (Tr. 522). Consistent with that testimony, the ALJ

found Plaintiff's medically determinable mental impairments of depression and ADD were non-severe (Tr. 13-14). The ALJ thoroughly addressed the remote and relevant medical and non-medical evidence in assessing Plaintiff's mental impairments and finding they resulted in only mild limitations in three functional areas and no limitation in the fourth functional area (Tr. 13-14 (citing Tr. 759-64 (03/06/20 Plaintiff's function report (no problems in memory, completing tasks, concentration, understanding, following instructions, or getting along with others), 860 (11/09/18 before alleged onset date, "discussed individual counseling"), 862 (12/07/18 pre-onset, "psych - negative"), 891 (9/12/20 "psychiatric-negative"), 893 (9/12/20 good eye contact, fluent speech, appropriate mood, clear thought processes, normal memory, good concentration, fully oriented)))). The ALJ further explained that he translated his "B criteria" findings into the mental residual functional capacity assessment (Tr. 14).

In his discussion of the residual functional capacity assessment, the ALJ observed that the consultants' expert opinions were consistent with the findings on consultative examination, wherein Plaintiff failed to complain of any mental health symptoms and the associated examination was normal (Tr. 17). Thus, the ALJ found persuasive the state agency psychological consultants' findings that Plaintiff had no more than a mild limitation in mental health functioning (Tr. 17).[1] Their expert medical findings support the ALJ's mental residual functional capacity assessment and final decision.

---

[1] In January 2020, state agency psychological consultant Margaret Meyer, M.D., opined that Plaintiff's mental symptoms would not significantly compromise his capacity for work related abilities, and Plaintiff was not limited to unskilled work due to his impairments (Tr. 544, 548). On reconsideration in September 2020, state agency psychological consultant Susan Posey, Psy.D., reviewed the record and found Plaintiff's "report of minimal mental functional limitations/sxs [symptoms] is consistent with the medical evaluation and overall EOR [ evidence of record]." (Tr. 558). Dr. Posey further found that Plaintiff's "limitations imposed no more than a non-severe impact [on] functioning." (Tr. 558). Again, the medical finding was that Plaintiff was not limited to unskilled work due to his impairments (Tr. 562).

The ALJ further noted that the psychological medical experts "referenced the good response to medication therapy in 2018, and the lack of follow up mental health treatment" during the entirety of the relevant period (Tr. 17). Fifth Circuit precedent is clear that when an impairment can reasonably be remedied or controlled by medication or treatment, it is not disabling and does not affect the claimant's residual functional capacity. *See Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988) (per curiam). Lack of treatment is also an indication of non-disability. *Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990). Thus, even had the ALJ not considered Plaintiff's non-severe mental impairments, that would not be reversible error on these facts.

In his third claim of error, Plaintiff asserts the ALJ erred in his credibility analysis by not specifically addressing Plaintiff's work history. According to Plaintiff, the ALJ assigned "partial weight to the Mr. Hardage's statements regarding intensity, persistence, and limiting effects of the alleged symptoms" but failed to provide any meaningful discussion of Plaintiff's remarkable work history. Dkt. No. 11 at 6. Plaintiff points out he had a solid work record, having consistently worked since 1985 before being forced to stop working due to disabling back pain and depression. *Id.* at 6-7. Plaintiff requests the Court remand the ALJ's decision with instructions to fully explain the credibility assessment in light of Plaintiff's continuous 30-year work history. *Id.* at 7.

According to the Commissioner, the ALJ performed a proper analysis of Plaintiff's subjective symptom complaints and gave several valid reasons for discounting his subjective complaints; thus, the ALJ's analysis fully comports with the relevant guidelines. Again, the Court agrees.

The "credibility" analysis the ALJ performs is part of the symptom evaluation process pursuant to applicable regulations. *See* 20 C.F.R. § 404.1529. The Agency defines a symptom as a claimant's own description of his physical or mental impairment, but a claimant's statements of

his symptoms alone are not enough to establish an impairment. *See* 20 C.F.R. § 404.1528(a). "It is within the ALJ's discretion to determine the disabling nature of a claimant's pain, and the ALJ's determination is entitled to considerable deference." *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001) (citations omitted). "Pain constitutes a disabling condition when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'" *Falco*, 27 F.3d at 163 (internal citations omitted). Subjective evidence need not take precedence over objective evidence. *Villa*, 895 F.2d at 1024. In evaluating a claimant's alleged symptoms, an ALJ may consider descriptions from physicians, the applicant, or others. *Hollis v. Bowen*, 837 F.2d 1378, 1386-87 (5th Cir. 1988). The ALJ considers all the various statements of the claimant, including statements to the agency, medical sources, and any other statements. The ALJ also reviews opinion and other evidence from medical and non-medical sources. The ALJ also considers the factors listed in 20 C.F.R. § 404.1529(c)(3). The ALJ is not required to discuss all factors in each case. *See Clary v. Barnhart*, 214 Fed. Appx. 479 (5th Cir. 2007) (unpublished) ("The ALJ is not required to mechanically follow every guiding regulatory factor in articulating reasons for denying claims or weighing credibility.").

Here, the ALJ performed a thorough symptom analysis setting forth the many factors he considered in discounting Plaintiff's subjective complaints regarding the intensity, persistence, and limiting effects of his symptoms (Tr. 15-19).[2] Specifically, the ALJ considered Plaintiff's subjective complaints, but noted specific inconsistencies between his complaints and the other record evidence. For example, the ALJ cited Plaintiff's September 2020 report to a consultative examiner that he received medical treatment a few times a year for back pain, and that he used prescription medications, Flexeril and Tylenol 3 routinely, generally a couple of times a week (Tr.

---

[2] Effective March 28, 2016, SSR 96-7p was superseded by SSR 16-3p, which eliminates the term "credibility" from the agency's sub-regulatory policy.

16, citing 890). The ALJ noted Plaintiff's claim was inconsistent with his lack of follow up with his prescribing providers for one full year, since September 2019, as there was no indication that the medications had been refilled since that time (Tr. 16). *Gonzales v. Astrue*, 231 Fed. Appx. 322, 325 (5th Cir. 2007). The ALJ properly considered Plaintiff's treatment records showing only occasional pain exacerbations addressed with conservative medication treatment. *See Parfait v. Bowen*, 803 F.2d 810, 813-14 (5th Cir. 1986). Plaintiff's use of only conservative, sporadic treatment supports the ALJ's subjective symptom finding.

The ALJ also considered Plaintiff's report of left arm "atrophy related to a remote neck impairment," but found his complaint was "not supported by the clinical findings on consultative medical examination. Specifically, there was normal motor strength and sensation in the upper extremities. Manipulative functioning was also intact bilaterally, with an ability to turn a doorknob, shuffle papers, use a pen, manipulate a coin, button/undo a button, and use a zipper." (Tr. 16). The ALJ further found "[t]here was no clinical or diagnostic findings to support an upper extremity impairment." (Tr. 16). The ALJ determined Plaintiff's statements regarding an inability to sustain the sitting required for sedentary position was inconsistent with the clinical findings on consultative medical examination (Tr. 17).

Plaintiff's statements that were inconsistent with the objective and other evidence and his gaps in treatment were valid reasons for the ALJ to discount Plaintiff's complaints of more limiting symptoms. The ALJ observed "[t]he record failed to document any adverse medication side effects not address[ed] with adjustment in medication." (Tr. 16). The ALJ further considered that the "record indicated good instrumental activities of daily living despite the severe and nonsevere impairments. Specifically, [Plaintiff] reported to the consultative examiner he was able to cook, drive, do laundry, use the internet, and care for pets. In addition, [Plaintiff] indicated his household

included an adult disabled son." (Tr. 16). Plaintiff further reported in his November 2019 work history report that since March of 2017 he was a sitter for a disabled girl, working five days a week for three hours a day (Tr. 704). The ability to care for two disabled individuals, at least part time, supports the ALJ's finding for some sedentary work.

In finding Plaintiff could perform some sedentary work, the ALJ considered Plaintiff's subjective complaints, the objective medical evidence, inconsistencies between Plaintiff's complaints and the other evidence, the conservative nature of treatment, the effectiveness of treatment, the gaps in treatment, the lack of side effects, and Plaintiff's non-sedentary daily activities. Plaintiff admits these were valid factors to consider and does not dispute that the ALJ correctly considered all of them, but he argues the ALJ "failed to provide any meaningful discussion of [his] remarkable work history." Dkt. No. 11 at 5-7 (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)).

The Commissioner argues that a plaintiff's work history is just one factor that the ALJ considers when determining credibility. According to the Commissioner, other than an Eighth Circuit case addressing a credibility analysis under the old guidelines, Plaintiff fails to cite any authority to support his contention that the ALJ was required to further discuss his "remarkable work history." Dkt. No. 12 at 14 (further noting SSRs 96-8p and 16-3p and 20 C.F.R. § 404.1529 reveal no language requiring an ALJ to consider that a claimant consistently worked as part of assessing the consistency of his complaints and described limitations). Additionally, the Commissioner asserts "20 C.F.R. § 404.1529(c)(3) merely requires the ALJ to 'consider all information presented, including information about your prior work record,'" noting the ALJ considered Plaintiff's earnings at step one to allow for a December 31, 2024, date last insured (Tr. 10; 12, Finding 1), and that Plaintiff retained the RFC to perform his past relevant work as a

programmer as generally performed (Tr. 19, Finding 6). The Commissioner contends there is no requirement that the ALJ specifically further consider Plaintiff's work history; however, even if the ALJ erred in failing to specifically mention Plaintiff's "remarkable work history," any error would be harmless under relevant Fifth Circuit law. Dkt. No. 12 at 15-17.

Within the Fifth Circuit, the work history of a claimant "is but one factor to consider when evaluating plaintiff's symptoms." *Thomas v. Comm'r of Soc. Sec.*, No. 2:20-CV-123-TBM-MTP, 2022 WL 590023, at *7 (S.D. Miss. Jan. 11, 2022), *report and recommendation adopted sub nom. Thomas v. Comm'r of Soc. Sec.*, No. 2:20-CV-123-TBM-MTP, 2022 WL 586768 (S.D. Miss. Feb. 25, 2022) (quoting *McGee v. Astrue*, 2012 WL 7456174, at *8 (W.D. La. Nov. 26, 2012), *report and recommendations adopted*, 2013 WL 704624 (W.D. La. Feb. 26, 2013); also citing *Crain v. Colvin*, 2016 WL 4471662, at *6 (S.D. Miss. Aug. 1, 2016), *report and recommendation adopted*, 2016 WL 4471882 (S.D. Miss. Aug. 24, 2016); *Wetzel v. Berryhill*, No. 5:17-CV-00364-RBF, 2018 WL 4664139 at *8-*10 (N.D. Tex. Sept. 28, 2018); *Bradshaw v. Saul*, 2019 WL 7461703 at *3 (N.D. Tex. Dec. 12, 2019)). The agency policies referenced by Plaintiff do not mandate that a claimant's work history be given any special significance. *Id*. (citing 20 C.F.R. § 404.1529(c)(3); SSR 16-3p); *see also Belcher v. Berryhill*, No. 6:17-CV-53, 2018 WL 3621211, at *6 (S.D. Tex. June 22, 2018) (citing *Bryant v. Astrue*, 272 Fed. Appx. 352, 356 (5th Cir. 2008)) ("If the ALJ provides an adequate narrative discussion explaining the basis behind his reasoning, he need not address every factor.")).

Regardless of whether an ALJ is required to specifically discuss or give "bolstering weight to a plaintiff's long work history, the record here reveals that the ALJ was aware of and actually discussed" Plaintiff's work history during the hearing (Tr. 512-15). *Wetzel*, 2018 WL 4664139 at *10. The ALJ was therefore aware of Plaintiff's work history at the time of his decision. *Thomas*,

2022 WL 590023, at *8. However, the ALJ determined that the subjective evidence and testimony from Plaintiff that would limit his ability to perform sedentary work-related activities contradicted the objective medical evidence in the record and gave sufficient reasons for his findings. *Id.* The ALJ was not required to provide special significance for Plaintiff's work history and did not err by failing to specifically acknowledge Plaintiff's lengthy work history in the ALJ's findings. *Id.*; *see also Wetzel*, 2018 WL 4664139 at *10.

Here, substantial evidence supports the ALJ's residual functional capacity assessment and step four finding that Plaintiff could perform his past relevant work of programmer as generally performed (Tr. 19). Thus, any perceived error by the ALJ in not addressing Plaintiff's work history was harmless, at most, because substantial evidence supports the ALJ's determinations. *See Turner-Clewis v. Saul*, No. 4:20-CV-372-A, 2021 WL 2302770, at *10 (N.D. Tex. May 19, 2021), *report and recommendation adopted*, No. 4:20-CV-372-A, 2021 WL 2291738 (N.D. Tex. June 4, 2021); *see also Garza Mundy v. Berryhill*, No. 1:18-CV-172, 2019 WL 5269177, at *6 (S.D. Tex. Sept. 12, 2019), *report and recommendation adopted*, No. 1:18-CV-00172, 2019 WL 5264651 (S.D. Tex. Oct. 17, 2019) (citations omitted) ("[I]t is not reversible error when the ALJ fails to consider plaintiff's work history to determine credibility. Any failure to consider work history as a factor constitutes harmless error.").

## **RECOMMENDATION**

"The Commissioner's decision is granted great deference and will not be disturbed unless the reviewing court cannot fund substantial evidence in the record to support the Commissioner's decision or finds that the Commissioner made an error of law." *Legget*, 67 F.3d at 565-66. Having reviewed the record, the Court determines the record shows that the Commissioner correctly

applied the applicable legal standards and that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, it is

        **RECOMMENDED** the above-entitled Social Security action be **AFFIRMED.**

<u>Objections</u>

        Within fourteen (14) days after service of the Magistrate Judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C.A. § 636(b)(1)(C). Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen days after service shall bar an aggrieved party from *de novo* review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court, except on grounds of plain error or manifest injustice. *Thomas v. Arn*, 474 U.S. 140, 148 (1985); *Rodriquez v. Bowen*, 857 F.2d 275, 267-77 (5th Cir. 1988).


        SIGNED this the 2nd day of August, 2023.


_____
J. Boone Baxter
UNITED STATES MAGISTRATE JUDGE